## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE DIVISION

| | | |
|---|---|---|
| PENNY COOTS | * | CIVIL ACTION NO. 12-2786 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Penny Coots, born June 25, 1963, filed applications for disability insurance benefits and a period of disability on April 27, 2010, alleging disability since November 29, 2005, due to disorder of the cervical, thoracic and lumbar spine, lipomas, disorder of the shoulder, and heart problems such as palpitations and angina.[1]

### FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the

---

[1]Claimant has acquired sufficient quarters of coverage to remain insured through September 30, 2010.  (Tr. 10).  Thus, she must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

Commissioner's decision comports with all relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[2]

**(1) Disability Determination Explanation by Dr. Hollis T. Rogers dated June 28, 2010**.  Claimant alleged disability due to macular degeneration, neck, heart, lipoma tumors, aneurysm of the brain, aneurysm of the spine, back, and depression.  (Tr. 45).  Dr. Rogers found that she had medically determinable impairments of disorders of the back – discogenic and degenerative, and anxiety disorders.  (Tr. 48).  Cheryl Marsiglia, Ph.D., determined that claimant's anxiety-related disorder did not meet or equal the Social Security listings for a mental impairment.  (Tr. 48-49).

As to claimant's physical residual functional capacity ("RFC"), Dr. Rogers determined that claimant had the ability to lift and/or carry (including upward pulling) 50 pounds occasionally, which he defined as "cumulatively 1/3 or less or an 8 hour day," and 25 pounds frequently, which he defined as "cumulatively

---

[2]Although all of the medical records were reviewed by the undersigned, only those relating to the arguments are summarized herein.

more than 1/3 up to 2/3 of an 8 hour day).  (Tr. 50).  He found that she could stand/walk and sit about six hours in an 8-hour workday.  He stated that she was limited in both upper extremities as to pushing and pulling "overhead both constantly."  He also found that she was limited as to reaching overhead, but was unlimited as to handling, fingering, and feeling.  (Tr. 50-51).  Dr. Hollis concluded that claimant was not disabled.  (Tr. 53).

**(2) Records from Dr. Nathan Landry dated January 8, 2004 to January 10, 2011**.  On June 4, 2007, claimant complained of wrist and right forearm pain. (Tr. 207).  She also complained of abdominal pain in the upper abdomen, epigastric, occasional chest pain, occasional heartburn, and nausea.

Dr. Landry's assessment was tendonitis NOS and gastritis and gastroduodenitis, unspecified.  Claimant was instructed to continue Darvocet and use a tennis elbow strap when active.

On September 12, 2007, claimant complained of a knot in the back of her head, restless legs, fatigue, and abdominal pain.  (Tr. 205).  She had a medical history of being assaulted at work, from which she sustained injuries to her left shoulder and arm, and an overuse injury of the right arm.  The assessment was restless leg syndrome, for which she was prescribed Sinemet, Keratosis, and abdominal pain in the right upper quadrant.  (Tr. 206).

3

On October 15, 2007, claimant complained of low back pain with radiation to the buttock and left thigh.  (Tr. 201).  A venous NIVA of the left leg was negative for a clot.  On examination, straight leg raising was negative, paraspinal tenderness was worse on the left, motor system was normal in the lower extremities, sensory and reflexes were normal, gait was unremarkable, and range of motion was normal.  Dr. Landry's assessment was sciatica, for which he prescribed prednisone.  (Tr. 202).

An MRI of the lumbar spine dated October 23, 2007, showed mild L4-L5 posterior annular bulging, a T10 vertebral body 12 mm, and a T2 hyperintensive mass.  (Tr. 219).

A lumbar MRI dated January 22, 2008, showed no evidence of significant canal or foraminal stenosis, and a stable ovoid 12 mm lesion within the T10 vertebral body which likely represented a slightly atypical benign hemangioma. (Tr. 218).

On May 21, 2008, claimant complained of right wrist pain.  (Tr. 189).  On examination, she had no swelling, tenderness of the wrist only with rotation, active and passive range of motion, normal grip strength, intact sensation in all fingers, and normal pulses.  The assessment was tendonitis NOS, for which Dr. Landry prescribed Darvocet, Napsylate, and a wrist support.  (Tr. 190).

4

A CT scan of the head dated July 22, 2008, was stable without evidence of acute intracranial abnormality.  (Tr. 214).

A venous NIVA of the lower extremities dated June 26, 2009, was normal, with no evidence of deep vein thrombosis.  (Tr. 213).

A CT of the brain dated November 11, 2009, showed no evidence of acute intracranial pathology, a stable low attenuation focus near the right temporal tip which could represent a small arachnoid cyst or volume averaging with a sulcus, and previous sinus surgery with prominent mucosal thickening within visualized portion of the right maxillary sinus.  (Tr. 212).

On January 10, 2011, Dr. Landry wrote that claimant had an Arachnoid cyst, and suffered from headaches and memory loss.  (Tr. 518).

**(3) Records from Dr. Laura Braham dated July 9, 2009 to March 16, 2010**.  On July 9, 2009, claimant complained of lower back pain with numbness and tingling in her legs and feet.  (Tr. 290).  On examination, claimant had tenderness to palpation of the lumbar spine near L2-L3, and pain on right leg raise but not on left.  She had decreased sensation to soft and pin-prick stimuli and a normal patellar reflex.  (Tr. 291).

Dr. Kevin Guillory's assessment was low back pain and paresthesias.  He prescribed Advil.

An MRI showed only degenerative changes.  (Tr. 289).  Dr. Guillory recommended moist heat and prescribed Skelaxin and a Medrol dose pack.

On November 3, 2009, claimant complained of left-sided back pains and burning in her left toes.  (Tr. 287).  Dr. Guillory found nothing abnormal on foot examination.  (Tr. 288).  He prescribed Cyclo`benzaprine.

On November 23, 2009, claimant complained of pain underneath her ribs in the left side radiating into her back.  (Tr. 285).  Dr. Braham's diagnosis was intercostal rib pain.  (Tr. 286).  She prescribed Advil, a rib belt, and heat application.

A cervical MRI dated December 15, 2009, showed a disc protrusion-extrusion at C5-6 central and paracentral to the left with mild cord effacement, and disc protrusion at C6-7 central and paracentral to the right approaching but not appearing to efface the cord.  (Tr. 528).  A lumbar MRI showed facet joint degenerative changes at L5-S1 and anterior spondylosis at T10-11.  (Tr. 529).

On March 16, 2010, claimant complained of recurrent thoracic back pain with tingling of her fingers and/or feet/toes numbness or sensation disturbance, and a swollen lymph node on the left side of her neck.  (Tr. 273).  On musculoskeletal examination, claimant's gait and station demonstrated standing and walking were stable and functional.  ( Tr. 274).  She had a palpable lipoma to

6

the left of her lower thoracic spine.  The assessment was a lipoma and degenerative disc disease.

**(4) Records from Lafayette General Medical Center dated June 5, 2006 to May 2, 2010**.  An MRI of the brain dated June 5, 2006, showed no evidence of abnormality.  (Tr. 305).  A head CT dated November 8, 2006, showed no evidence of central nervous system abnormality and minimal mucoperiosteal thickening of the left sphenoid sinus.  (Tr. 302).

**(5) Records from Dr. Ilyas Munshi dated December 17, 2009 to January 6, 2011**.  On December 17, 2009, claimant complained of constant left neck, shoulder, and arm pain, and upper left lumbar, left buttock, hip, thigh, knee, leg, ankle, and foot pain.  (Tr. 432).  She also reported arm and left leg/foot weakness, numbness/tingling.  (Tr. 433).  The Psychological Review of Systems was negative for anxiety, depression, bipolar disorder, dementia, or any type of drug abuse.

On cervical spine examination, claimant had normal alignment and tenderness to palpation at C4-5, C5-6, C6-7, and diffusely in the posterior neck. Range of motion was normal, but painful.  Lumbar spine exam showed tenderness to palpation diffusely and on both sides, decreased range of motion, and negative straight leg raise.  (Tr. 434).

Cervical MRI showed a disc bulge at C4-5 and C5-6.  Lumbar MRI revealed degenerative disc changes at L5-S1, and a synovial cyst on the left side at L5-S1.  Dr. Munshi's diagnosis was cervical spine and back pain.  He recommended injections, which claimant had on January 6, 2010.  (Tr. 438).

On April 1, 2010, claimant complained of lower left posterior neck pain and a lumbar lipoma causing back pain.  (Tr. 295).  On cervical spine examination, she had normal alignment, and tenderness to palpation at C4-5, C5-6, C6-7, and diffusely in the posterior neck.  (Tr. 296).  Range of motion was normal, but painful.  In the lumbar spine, she had developed a lipoma over the left side at about the mid-lumbar level.

Dr. Munshi's diagnoses were subcutaneous lipoma and cervical spine pain. He noted that she had cervical spondylosis with pressure at C5-6 and C6-7.  He recommended an anterior diskectomy at C5-6 and C6-7 and removal of her lipoma.

On April 15, 2010, Dr. Munshi performed an anterior cervical diskectomy at 5-6 and 6-7 and removal of pressure on the spinal cord nerve roots and fusion from 5-7, and removal of left upper lumbar lipoma.  (Tr. 298).

Post-operatively on April 27, 2010, claimant was doing better than before surgery.  (Tr. 479).  Her wound had healed well, and her back had improved.

8

On May 11, 2010, claimant complained of left posterior neck stiffness and swelling to her shoulder and anterior chest.  (Tr. 481).  She had mild spasm on cervical spine examination.  Dr. Munshi recommended massage therapy for her neck pain and spasms.  (Tr. 482).

Claimant complained of severe posterior neck swelling and tenderness, bilateral hand and feet numbness and tingling, bilateral leg tenderness, and left calf swelling that decreased after elevation, on May 18, 2010.  (Tr. 484).  On cervical spine examination, her alignment was kyphotic, she had tenderness to palpation at C5-6 and C6-7, and mild to moderate muscle spasm.  Dr. Munshi's diagnosis was cervical spine pain and spondylosis.

An MRI and CT of the cervical spine dated May 20, 2010, showed no evidence of recurrent disc herniation at C5-6 and C6-7, and at least moderate right foraminal stenosis at C5-6.  (Tr. 486-87).

On June 22, 2010, claimant noted that she was doing better until the prior day when she tripped and fell at home.  (Tr. 491).  She complained of diffuse soreness.  On examination, claimant had tenderness to palpation at C5-6 and C6-7, on both sides, and in the cervical spine, and mild muscle spasm.  Dr. Munshi's diagnoses were cervical spine pain, and spondylosis and unruptured aneurysm or AVM.

9

On June 29, 2010, claimant reported left-sided neck pain down into her left arm after falling one week prior.  (Tr. 493).  A CAT scan of the cervical spine showed that the bone plugs and plate were in position, and the foraminas were mildly narrowed.  (Tr. 494).  Dr. Munshi recommended therapy.

An MRV of the brain dated August 16, 2010, showed no significant abnormality.  (Tr. 357).  A brain MRA revealed congenital anomalous changes of intracerebral circulation, but no acute abnormalities.  (Tr. 360).  An MRI of the brain showed no acute intracranial abnormality and a small CSF pocket in the right middle fossa anteriorly consistent with a small arachnoid cyst.  (Tr. 361).

A cervical MRI showed an anterior cervical fusion C5 through C7 with improved appearance of cord effacement at C5-6 and C6-7, development of mild diffuse disc protrusion at C4-5 slightly eccentric to the right and a small synovial cyst, and progression of central disc bulge/protrusion at C3-4.  (Tr. 356).  An MRI of the thoracic spine revealed mild thoracic scoliosis, distal thoracic spondylosis, a slight central disc bulge at T10-11, and a benign intraosseous hemangioma of the T10 vertebral body.  (Tr. 358).  A lumbar MRI was stable with degenerative facet changes at L5-S1.  (Tr. 359).

On August 19, 2010, claimant complained of persistent posterior left-sided neck pain radiating to her left elbow and mid-back, and lower back pain radiating

10

to her left leg with activity and standing for long periods.  (Tr. 501).  Dr. Munshi recommended therapy and prescribed muscle relaxants.  (Tr. 502).

On September 28, 2010, claimant continued to complain of neck and left shoulder pain.  (Tr. 505).  She believed that her pain was worse than before starting physical therapy.  On cervical spine examination, her alignment was kyphotic, she had tenderness to palpation, mild muscle spasm, and limitation in movement when she looked to the left.  Dr. Munshi recommended neck injections, which claimant had on October 11 and 25, 2010.  (Tr. 506, 510-13).

On November 2, 2010, claimant complained of left-sided neck pain with some intermittent swelling and low back pain.  (Tr. 516).  Her posterior neck pain had improved since the injections.  On cervical spine examination, claimant had tenderness to palpation, moderate muscle spasm, rigidity and pain with range of motion, asymmetric muscle size, limitation in movement when looking to the left, abnormal posturing caused by abnormal muscle tone, tenderness to palpation on the left side and trapezius, and decreased range of motion.  (Tr. 516-17).

Dr. Munshi's diagnoses were cervical spine pain and spondylosis, back pain, and cervical dystonia, spasmotic.  (Tr. 517).  He recommended Botox therapy.

11

On December 9, 2010, claimant noted that her neck muscles were a lot softer after Botox therapy, but she still had decreased range of motion in all directions and persistent tenderness in the left side of her neck.  (Tr. 519).  On examination, she had no muscle spasm and improvement in neck movement when she looked to the left.

Dr. Munshi's diagnoses were cervical spine pain and spondylosis, back pain, and cervical dystonia, spasmodic.  (Tr. 519-20).  He also noted that claimant had a left supraclavicular lipoma, for which he recommended a general surgeon. (Tr. 520).

On January 6, 2011, claimant complained of neck pain, especially on the left side, pain down the left arm, and low back pain because most of her lipomas had returned.  (Tr. 521).  On examination, her cervical spine alignment was normal. Palpation of the supraclavicular area revealed an apparent small lipoma.  Dr. Munshi's diagnoses were small supraclavicular lipoma, cervical spine pain, and cervical spondylosis.

### (6) Physical/Occupational Therapy Records from Acadiana Physical Therapy & Sports Medicine dated August 26, 2010 to September 22, 2010.[3]

---

[3]Physical therapists qualify as "other sources" under 20 C.F.R. § 404.1513(d) which sources may be considered but are entitled to significantly less weight than "acceptable medical sources."  *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *Johnson v. Commissioner of Social*

On September 22, 2010, Scot Jones, PT, stated that claimant had shown no improvement in PT.  (Tr. 362).  He reported that her pain remained unchanged, and that she felt worse than she had over the past two weeks.  He noted that her cervical stiffness, pain, and muscle spasm were very consistent and resistant to pain-relieving modalities.  She complained that therapy sometimes exacerbated her pain.

**(7) Records from Dr. Laura Braham dated July 9, 2010 to December 14, 2010**.  On July 9, 2010, claimant complained of depressed/sad feelings, frustration, insomnia, anxiety, vertigo or dizziness, right thumb swelling with soreness, neck pain after falling, and mid to lower back pain on the left side.  (Tr. 369).  On musculoskeletal examination, gait and station demonstrated that standing and walking were stable and functional.  (Tr. 371).  Claimant had mild swelling and tenderness to palpation over the right thenar eminence with full range of motion in the right thumb.  Right hand views were negative.  (Tr. 375).

Dr. Braham's assessment was right thumb pain, falls, left flank myalgias, degenerative disc disease, hyperlipidemia, other and unspecified, and unspecified anomaly of brain, spinal cord, and nervous system.  (Tr. 371).  She was prescribed Cymbalta.

---

*Security*, 2013 WL 4414824, *5 n. 2 (W.D. La. Aug. 15, 2013).

On September 22, 2010, claimant complained of a black spot on her back and an intermittent lump on her left arm with pain to her forearm.  (Tr. 364).  She also stated that she had been going to physical therapy, but it had not been helping.  She reported that her back condition was improving.

On musculoskeletal examination, gait and station demonstrated standing and walking were stable and functional.  (Tr. 366).  Fingers-fingernails and toes-toenails were unremarkable.  In the left upper extremity, forearm muscles were palpated and symmetric when compared to the right, with no abnormal papules palpated.  Neurological exam was normal.

The assessment was nose/nasal problems, upper respiratory infection, acute bronchitis, mole or nevus of skin, degenerative disc disease, hyperlipidemia, other and unspecified, and unspecified anomaly of brain, spinal cord, and nervous system.

On October 6, 2010, claimant returned to the clinic for minor surgery to be performed on a suspicious nevus on her back.  (Tr. 546).  She also complained of a nodule on the outside of her right foot with mild discomfort.

On examination, gait and station demonstrated that standing and walking were stable and functional.  (Tr. 547).  Neurologically, claimant had no defects

involving cranial nerves.  Psychiatrically, insight and judgment appeared to be intact and appropriate.

The assessment was mole or nevus of skin, ganglion cyst, degenerative disc disease, hyperlipidemia, other and unspecified, and unspecified anomaly of brain, spinal cord, and nervous systems.  (Tr. 547).  The nevus was removed.

On December 14, 2010, claimant reported symptoms of neck stiffness, neck pain or problems, neck swelling, and muscle pain.  (Tr. 534).  Neurologically, she had no complaints.

On examination, claimant had a left posterior cervical lymph node at the base of the hairline.  Neck tissue demonstrated supraclavicular asymmetry on the left.  Gait and station demonstrated that standing and walking were stable and functional.  Fingers-fingernails and toes-toenails were unremarkable.  Insight and judgment appeared to be intact and appropriate.

The assessment was left neck lump, mass or localized superficial swelling of skin, depression with anxiety, degenerative disc disease, hyperlipidemia, other and unspecified, and unspecified anomaly of brain, spinal cord, and nervous system.  (Tr. 535).

**(8) Records from Dr. Munshi dated January 11, 2011 to April 17, 2012.**

On March 29, 2011, claimant complained that her neck pain was unchanged, and noted a "snapping" noise and pain in her neck with left lateral rotation.  (Tr. 556).  She also complained of a recurrent lump in her lower back causing pain to radiate down her left leg, and cramping and soreness from her posterior thigh to her foot.  On lumbar examination, her alignment was forward flexed, and she had tenderness to palpation at L5-S1 and on the left, decreased range of motion, and positive left straight leg raise at 40 degrees.

An MRI showed a left L5-S1 synovial cyst with some foraminal pressure. (Tr. 557).  Dr. Munshi's impression was back pain and radiculopathy.  He recommended surgery.

On April 13, 2011, Dr. Munshi performed an endoscopic left L4-5 hemilaminotomy, facet foraminotomy with removal of pressure of nerve roots on the thecal sac with diskectomy at both levels.  (Tr. 581-82).  She had an excision of an upper lumbar lipoma on April 15, 2011.  (Tr. 554).

At a follow-up exam on April 28, 2011, claimant noted improvement in her lower back and left leg pain, as well as improvement in left hip pain.  (Tr. 554). She also thought that a piece of the IV catheter was left in her right wrist.

On May 2, 2011, Dr. Mushi performed a left wrist incision with removal of thrombosed vein, with possible removal of retained catheter. (Tr. 575). At a follow-up exam on May 10, 2011, claimant's right wrist wound was healing well. (Tr. 552). She noted increasing short-term memory loss and left eye nystagmus.

On examination, lumbar nerve root provocation testing showed negative straight leg raise bilaterally. Claimant had a normal mental status. Dr. Munshi concluded that claimant was doing better overall, though her leg was still tight. (Tr. 553).

On August 9, 2011, claimant complained of bilateral hip pain with increased activity, and posterior neck pain and bilateral shoulder pain after washing her car. (Tr. 550). On cervical spine examination, claimant's alignment and range of motion were normal. (Tr. 551). She had tenderness to palpation and painful range of motion. Mental status examination was normal.

Cervical spine x-ray findings were consistent with an anterior spinal fusion at C5-6 and C6-7. Dr. Munshi's impression was back pain with radiculopathy. He recommended that claimant take muscle relaxants for her neck pain and spasms.

On April 17, 2012, claimant complained of a tumor pressing on her left side of her lower back radiating into her left leg. (Tr. 634). On examination, she had a

lipoma under the skin at the level of the iliac crest.  (Tr. 635).  The diagnosis was back pain.  Dr. Munshi recommended physical therapy.  (Tr. 643).

**(9) Claimant's Administrative Hearing Testimony**.  At the hearing on January 11, 2011, claimant testified that she had last worked in November, 2005 at a bingo hall and in catering.  (Tr. 27, 30).  She reported that she left because she was attacked and robbed in the parking lot.  She said that she received worker's compensation for about a month and a half.  (Tr. 28).

Claimant testified that she had not looked for work because she could not do it.  She stated that she had a tendency to fall, and injured herself every time.  (Tr. 29).  She stated that the surgery was helpful until she fell.  (Tr. 30).

Regarding complaints, claimant testified that she had a tumor in which she got lipomas over most of her body.  (Tr. 30).  She reported that she had constant neck pain, some back pain, and decreased strength in her left side.  (Tr. 31, 38, 41).  Additionally, she reported that she had trouble sleeping, daily headaches, sinus problems, memory loss, macular degeneration, and right wrist weakness, which was improving.  (Tr. 34, 39-42).

Claimant testified that she was taking pain medications, which made her sleepy.  (Tr. 31-32).  She also complained about heart symptoms, for which her

doctor had just increased her medication.  (Tr. 32).  She stated that she was a smoker.

As to activities, claimant testified that she drove, but not too often because it was painful.  (Tr. 33).  She stated that driving more than 10 miles or 30 minutes was too long.  She reported that she went grocery shopping, but could not lift anything heavy like a 12-pack of Coke.  (Tr. 35).  She complained that her back hurt after about three minutes of standing while washing dishes.  (Tr. 36).

Regarding restrictions, claimant testified that the heaviest thing she could lift was a pot.  (Tr. 34).  She complained of left arm and shoulder pain if she picked up too much.  She said that she could stand or walk for about 15 minutes, then had to sit.  She reported that she had to change positions every 15 minutes. (Tr. 35).  She stated that she had maybe three or four good days a month.  (Tr. 38).

**(10) Administrative Hearing Testimony of Lionel J. Bordelon, Vocational Expert ("VE")**.  Mr. Bordelon classified claimant's past work as a bingo hall manager as light with a Specific Vocational Preparation ("SVP") of 7, and caterer as medium with an SVP of 7.  (Tr. 30).

**(11) The ALJ's Findings**.  Claimant argues that: (1) the ALJ's RFC assessment conflicts with his own evaluation of Dr. Rogers' medical opinions and

minimizes key medical evidence, and (2) the ALJ failed to comply with 20 C.F.R.

§ 404.1529 and SSR 96-7p in assessing her credibility.

Claimant's disability insured status expired on September 30, 2010.  (Tr.

10).  The Social Security regulations provide as follows:

> An individual is entitled to the establishment of a period of disability
> and to disability insurance benefits in any month only if he or she
> enjoys fully insured status as defined in Section 216(i)(3) and Section
> 223(c), and has had not less than 20 quarters of coverage during the
> 40-quarter period ending with the quarter in which disability occurs.

*Oldham v. Schweiker*, 660 F.2d 1078, 1080, n. 1 (5th Cir. 1981) (*citing* 42 U.S.C. §

416(i)(3); 42 U.S.C. § 423(c)).  Thus, a claimant is eligible for benefits only if the

onset of the qualifying medical impairment began on or before the date the

claimant was last insured.  *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

Claimants bear the burden of establishing a disabling condition before the

expiration of their insured status.  *Id*. (*citing Milam v. Bowen*, 782 F.2d 1284 (5th

Cir.1986)).  Factors relevant to the determination of the date of disability include

the individual's declaration of when her disability began, her work history, and

available medical history.  *Id*.  (*citing* SSR 83–20).

First, claimant argues that the ALJ's RFC assessment conflicts with his own

evaluation of Dr. Rogers' medical opinions.  Specifically, she asserts that the

ALJ's findings were internally inconsistent, because he found that claimant was

"more limited than Dr. Rogers found her to be," but included a less restrictive manipulative limitation in his RFC assessment.  [rec. doc. 8, p. 6].

Dr. Rogers found that claimant was limited to reaching "overhead only both *constantly*." (emphasis added).  (Tr. 51).  In his decision, the ALJ determined that claimant was "limited in reaching overhead bilaterally to *no more than occasional*." (emphasis added).  (Tr. 17).

Claimant argues that, "although the ALJ found that [she] was *more* limited than Dr. Rogers opined, the ALJ included a *less* restrictive manipulative limitation in his RFC assessment." [rec. doc. 8, p. 6]  Instead, she asserts, a limitation that is constant "precludes one from doing the task at all," and "should result in an RFC restricting the claimant to *never* performing overhead reaching." (emphasis added).  [rec. doc. 8, pp. 6-7].

The ALJ considered Dr. Rogers' opinion that claimant could perform medium exertional work with limitations in performing activities overhead.  (Tr. 17).  However, the ALJ found that, for the time period at issue, "claimant was more limited than Dr. Rogers found her to be." (Tr. 17).  He concluded that claimant would be limited to sedentary work, but would also be limited "in reaching overhead bilaterally to no more than occasional."

21

In his report, Dr. Rogers opined that claimant was "limited" in the upper extremities as to reaching "overhead only both constantly."  (Tr. 51).  Under the Dictionary of Occupational Titles ("DOT"), "constantly" means "activity or condition exists 2/3 or more of the time."  DOT Appendix C.  Dr. Rogers defined "occasionally" as an activity that occurred "cumulatively 1/3 or less of an 8 hour day."  (Tr. 50).  This is consistent with the DOT, which defines "occasionally" as "activity or condition exists up to 1/3 of the time."  DOT Appendix C.  Further, the Social Security Regulations provide that "'occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday."  SSR 96-9p (July 2, 1996).

Thus, contrary to claimant's argument, Dr. Rogers' opinion that she could do work which did not require "constant" overhead reaching supports the ALJ's finding that she could do work that required only "occasional" overhead reaching as defined by Dr. Rogers, the DOT and SSR 96-9p.  There is no legal support for claimant's assertion that the inability to perform a task on a "constant" basis precludes one from doing the task at all.

Next, claimant argues that the ALJ erred in assessing her residual functional capacity, citing SSR 96-8p, which provides, in pertinent part, as follows:

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.

***

The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.

***

[I]n order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

***

The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual.
Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately.

***

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

23

[rec. doc. 8, p. 8].

The Fifth Circuit has determined that the Social Security Administration's rulings are not binding on the court, but they may be consulted when the statute at issue provides little guidance. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The Fifth Circuit has frequently relied upon the rulings in evaluating ALJs' decisions. *Id.* (*citing Newton v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000) (relying on SSR 96-2p); *Scott v. Shalala,* 30 F.3d 33, 34 (5th Cir. 1994) (relying on SSR 83-12); *Spellman v. Shalala,* 1 F.3d 357, 362 (5th Cir. 1993) (relying on SSR 83-20)).

Claimant asserts that the ALJ's RFC assessment failed to include the required narrative discussion describing how the evidence supported each of his conclusions and failed to include a function-by-function assessment of her ability to perform the exertional and nonexertional requirements of work activity. [rec. doc. 8, p. ]. However, the record reflects that the ALJ referenced the RFC assessment prepared by the state agency medical consultant, Dr. Rogers, who assigned claimant a medium RFC. (Tr. 17, 50-51). This satisfies the function-by-function assessment requirement. *Beck v. Barnhart*, 205 Fed.Appx. 207, 214 (5th Cir. 2006) (*citing Onishea v. Barnhart*, 116 Fed.Appx. 1, 2 (5th Cir. 2004) (stating

that an RFC assessment based in part on the function-by-function analysis of claimant's exertional limitations contained in a state examiner's medical report satisfies the legal standard set forth in *Myers v. Apfel*, 238 F.3d 617, 620-621 (5th Cir. 2001) and SSR 96-8p)).

Additionally, the record reflects that the ALJ specifically cited SSR 96-8p in his decision. (Tr. 11). Further, he considered all of the medical evidence, including the records from Drs. Landry, Braham, and Munshi. (Tr. 12-17). Moreover, he analyzed each impairment in detail. This complies with the requirements of SSR 96-8p. *Porter v. Barnhart*, 200 Fed.Appx. 317, 319 (5th Cir. 2006) (finding compliance with SSR 96–8p when the ALJ considers the record as a whole); *Williams v. Astrue*, 2008 WL 4490792, *11 (N.D. Tex. Oct. 3, 2008) ("[a]lthough SSR 96–8p requires a function-by-function analysis, if the record reflects the ALJ applied the appropriate standard and considered all the evidence in the record, there is no error").

Finally, claimant asserts that the ALJ failed to follow 20 C.F.R. § 404.1529(c) and SSR 96-7p, which provide that the decision must contain specific reasons for the ALJ's finding on credibility.

Section 404.1529(c)(3) provides, in pertinent part, as follows:

Factors relevant to your symptoms, such as pain, which we will

consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (*e.g.*, lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 1529(c)(3).

SSR 96-7p provides, in pertinent part, as follows:

It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision *must contain specific reasons* for the finding on credibility, *supported by the evidence in the case record*, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p (1996).  (emphasis added).

Claimant argues that the ALJ failed to comply with 20 C.F.R. § 404.1529 and SSR 96-7 regarding her credibility because his analysis consisted of a single conclusory sentence in which he found her complaints not credible to the extent that they were inconsistent with the RFC assessment.  [rec. doc. 8, p. 10]. Specifically, she argues that he failed to consider the report of Mandie M. Domingue;[4] the September 22, 2009, report by her physical therapist noting her cervical stiffness, pain, and muscle spasms which were resistant to pain-relieving modalities; her diagnosis of spasmodic cervical dystonia, and the extent of her "unbearable" pain as she reported to Dr. Munshi just days before her date last insured and which she testified was a constant daily pressure in her life.

The ALJ found that claimant's impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  (Tr. 15).  He then addressed

---

[4]According to the Function Report – Adult – Third Party, Mandie M. Domingue is claimant's daughter.  (Tr. 132).  In the Fifth Circuit, the ALJ has broad discretion in determining the credibility of medical experts as well as lay witnesses and to weight their opinions and testimony accordingly.  *Jacobs v. Shalala*, 997 F.2d 880, *5 (5th Cir. 1993).  Determinations of credibility of witnesses and the weight to be given the evidence are for the trier of facts and not for the Courts on review.  *Parker v. Richardson*, 348 F. Supp. 201, 202 (W.D. La. 1972) (*citing Stillwell v. Cohen*, 411 F.2d 574 (5th Cir. 1969); *Celebrezze v. Zimmerman*, 339 F.2d 496, 497 (5th Cir. 1964)).  In this case, Mandie M. Dominque did not testify at the hearing.

each of her medical impairments, noting that while she had a problem with her thoracic and lumbar spine, MRIs showed only mild annular bulging at L4-5, mild facet joint degenerative changes, mild thoracic scoliosis, a slight central disc bulge at T10-11, and stable lumbar MRI.  (Tr. 16).  Additionally, he noted that, despite her subjective complaints, numerous records showed that claimant had unremarkable gait, normal range of motion, and/or 5/5 motor strength in all extremities.

As to her cervical spine, the ALJ noted that post-surgery, claimant had 5/5 bilateral upper and lower extremity strength, no evidence of disc herniation at C5-6 and C6-7, at least moderate foraminal stenosis at C5-6, improved appearance of cord effacement at C5-6 and C6-7, mild diffuse disc protrusion at C4-5 slight eccentric to the right and a small synovial cyst at facet joint, and progression of central disc bulge/protrusion at C3-4.  (Tr. 16).  He observed that while she did not improve with physical therapy, her therapist indicated in September, 2010, that her grip strength was grossly equal, but she did have 1 grade decrease in her left C7 strength at the wrist and elbow, and deep tendon reflexes and sensation were within normal limits.  (Tr. 17).  Additionally, he noted that at a followup visit with her physician in September, 2010, she still had normal motor strength, but had left-sided stiffness and neck pain, for which she had steroid injections.  Further, he

summarized in November, 2010, she had rigidity in the neck, for which she tried Botox injections and had improvement.

The record reflects that on November 2, 2010, claimant's posterior neck pain improved after having injections. (Tr. 516). Additionally, she reported on December 9, 2010, that her neck muscles were a lot softer after Botox therapy. (Tr. 519). On examination, she had no muscle spasm and improvement in neck movement when she looked to the left. At her examination on January 6, 2011, her cervical spine alignment was normal as opposed to kyphotic. (Tr. 521).

If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). As the ALJ's finding as to credibility is supported by substantial evidence, it is accorded great deference. *Newton*, 209 F.3d at 459.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within

fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed January 6, 2014, at Lafayette, Louisiana.


_C. Michael Hill_____
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

```
Copy sent:  RFD
On:  1-7-14
By:  MBD
```

30